## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF VIRGINIA
### Richmond Division

REGINA WEBSTER,    )
          )
    Plaintiff,   )
          )
v.          )  Civil Action No. 3:20-cv-344–HEH
          )
CHESTERFIELD COUNTY SCHOOL )
BOARD,        )
          )
    Defendant.  )

### MEMORANDUM OPINION
### (Granting Defendant's Motion for Summary Judgment)

This unfortunate case, brought under Title VII of the Civil Rights Act of 1964,[1] exemplifies the challenging environment faced daily by special education teachers. Plaintiff, Regina Webster ("Plaintiff"), is an Instructional Assistant in Special Education with Chesterfield County Public Schools ("CCPS"). In her Complaint, filed against the Chesterfield County School Board ("the School Board"), Plaintiff alleges that she was subjected to a sexually hostile work environment by an intellectually challenged eight-year-old, second grade student (hereinafter referred to as "SM").[2] While the School Board does not dispute Plaintiff's allegations that she was subjected to unwelcome

---

[1] Plaintiff also brings an Americans with Disabilities Act ("ADA") claim, but Plaintiff's ADA claim will be dismissed with prejudice pursuant to the parties' joint Stipulation of Dismissal as to Count II (ECF No. 56). Thus, the sole claim remaining is Plaintiff's allegation that the School Board created a hostile work environment in violation of Title VII.

[2] It appears that SM was eight years old for most of the 2018–19 school year, turning nine in the spring. (*See* ECF No. 40 at 3, ¶ 8; ECF No. 28 at 13.) The Court will refer to SM as being eight years old because, based upon the record as a whole, this appears to be his age during the majority of the events in question.

touching by the child, it maintains that the evidence would not support a finding that the child is capable of distinguishing between the male and female gender. The School Board also maintains that its evidence would demonstrate that such unfortunate misbehavior is not uncommon in special education classes.

Presently before the Court is the School Board's Motion for Summary Judgment filed pursuant to Federal Rule of Civil Procedure 56. The School Board maintains that a vital prerequisite to proof of a sexually hostile work environment is some plausible evidentiary basis for a fact finder to conclude that the alleged hostility was sexually motivated. SM, whose behavior is at issue in this case, is a special education student with Down's Syndrome and Attention Deficit Hyperactivity Disorder. Although he is eight years old, "his mental and emotional capacity is delayed by multiple years." (ECF No. 28 at 13; *see also* ECF No. 39 ¶ 9.) Notwithstanding the absence of expert testimony challenging the opinion of the School Board's experts, Plaintiff contends that the question of whether SM is capable of a sexually motivated touching is an issue which should be decided by a jury as opposed to the Court. Regardless of her status as a special education teacher who works with some of the most challenging students, Plaintiff alleges that SM's conduct was so severe and pervasive that it was unexpected for a special education teacher to be subjected to such conduct. Indeed, Plaintiff charges that the School Board should be liable for its insufficient response to SM's improper conduct.

Both sides have submitted memoranda supporting their respective positions. The Court heard oral argument on February 9, 2021, and the Motion is ripe for review. For all the reasons stated below, the Court will grant the Motion for Summary Judgment.

# I. STANDARD OF REVIEW

Pursuant to Rule 56, summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). The relevant inquiry in the summary judgment analysis is "whether the evidence presents a sufficient disagreement to require submission to a [trier of fact] or whether it is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251–52 (1986). Once a motion for summary judgment is properly made and supported, the opposing party has the burden of showing that a genuine factual dispute exists. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 585–86 (1986).

"[T]he mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson*, 477 U.S. at 247–48. A material fact is one that might affect the outcome of a party's case. *Id.* at 248; *Hogan v. Beaumont*, 779 Fed. App'x 164, 166 (4th Cir. 2019). A genuine issue concerning a material fact only arises when the evidence, viewed in the light most favorable to the nonmoving party, is sufficient to allow a reasonable trier of fact to return a verdict in the party's favor. *Anderson*, 477 U.S. at 248.

The existence of a mere scintilla of evidence in support of the nonmoving party as well as conclusory allegations or denials, without more, are insufficient to withstand a summary judgment motion. *Tom v. Hosp. Ventures LLC*, 980 F.3d 1027, 1037 (4th Cir. 2020). Accordingly, to deny a motion for summary judgment, "[t]he disputed facts must

3

be material to an issue necessary for the proper resolution of the case, and the quality and

quantity of the evidence offered to create a question of fact must be adequate . . . ."

*Thompson Everett, Inc. v. Nat'l Cable Adver.*, 57 F.3d 1317, 1323 (4th Cir. 1995) (citing

*Anderson*, 477 U.S. at 252). "[T]here must be 'sufficient evidence favoring the

nonmoving party for a jury to return a verdict for that party. If the evidence is merely

colorable, or is not significantly probative, summary judgment may be granted.'"

*Holland v. Wash. Homes, Inc.*, 487 F.3d 208, 213 (4th Cir. 2007) (citing *Anderson*, 477

U.S. at 249–50). "A genuine issue of material fact is not created where the only issue of

fact is to determine which of the two conflicting versions of the plaintiff's testimony is

correct." *Barwick v. Celotex Corp.*, 736 F.2d 946, 960 (4th Cir. 1984). When applying

the summary judgment standard, courts must construe the facts in the light most

favorable to the nonmoving party and may not make credibility determinations or weigh

the evidence. *Holland*, 487 F.3d at 213.

Courts may make inferences based on expert testimony in the record. *See Textron*

*Inc. ex rel. Homelite Div. v. Barber-Colman Co.*, 903 F. Supp. 1558, 1565 (W.D.N.C.

1995). "Thus, the inferences a court is asked to draw by expert testimony must be

reasonable in light of competing inferences." *Id.* "Neither the factual assumptions

underlying an expert's opinion nor the expert's inferences from the facts assumed are

automatically established by the absence of directly countering expert opinion." *Erie Ins.*

*Exch. v. Stark*, 962 F.2d 349, 353 (4th Cir. 1992). "The credibility of competing experts

is a question for the jury only if the party with the burden of proof has offered enough

evidence to sustain a verdict in its favor." *Alevromagiros v. Hechinger Co.*, 993 F.2d

417, 421 (4th Cir. 1993).

## II.   BACKGROUND

The evidence in the record reveals that Plaintiff has been employed by CCPS since

September 2006 as an Instructional Assistant in Special Education at Providence

Elementary School. (ECF No. 50, Ex. 2 ¶ 3.)  Until Spring 2018, she was assigned to

instruct emotionally disturbed ("E.D.") students. (*Id.*)  However, in 2018, allegedly

without her consent, Dr. Sharon Rucker ("Dr. Rucker"), Principal of Providence

Elementary, transferred Plaintiff to a different type of special education classroom, which

focused on students with moderate intellectual disabilities ("I.D.").  (*Id.* ¶¶ 4–5.)  There,

she was assigned to assist Ms. Kesha Ellerbee ("Ms. Ellerbee"), the I.D. classroom

teacher. (ECF No. 40 at 2–3, ¶ 7.)  Plaintiff was displeased with the reassignment and

requested a transfer back to her former assignment in the E.D. classroom. (ECF No. 50,

Ex. 2 ¶¶ 11–12.)  Dr. Rucker declined to do so.[3]  (*Id.*)

From the inception of the school year, Plaintiff experienced inappropriate touching

by SM. (*Id.* ¶ 7.)  This included "inappropriately touching [her] by putting his hands up

[her] dress and touching [her] private parts." (*Id.* ¶¶ 7–8.)  Plaintiff maintains that such

inappropriate conduct occurred on almost a daily basis. (*Id.*)  According to Plaintiff, she

continuously recounted her experiences with SM to Dr. Rucker and her assistant, to no

---

[3] Plaintiff maintains that her reassignment was a result of her reports to Dr. Rucker that the E.D. teacher she was assigned to had been both physically and verbally abusive to students. (ECF No. 50, Ex. 2 ¶¶ 5–6.)  The School Board asserts that the transfer was merely a staffing decision within their discretion. (*See* ECF No. 40 at 2–3, ¶ 7.)

avail. (*Id.* ¶¶ 11–12.) Dr. Rucker's response was that she did not "have anywhere else to put [Plaintiff]," so that was where she would stay.[4] (*Id.* ¶ 12.) Moreover, Plaintiff maintains that the classroom teacher she was assigned to assist, Ms. Ellerbee, was "generally dismissive of [Plaintiff's] concerns about the harassing behavior and even tried to defend it by saying that it was just SM's personality." (*Id.* ¶ 13.) Still, SM was "consistently referred to—by teachers, [instructional assistants] and school administrators—as a 'sweet little boy,' a 'sweetheart,' 'the sweetest little thing,' or 'sweet as he can be.'" (ECF No. 40 at 3, ¶ 9.)

For the first month of the 2018–19 school year, Ms. Ellerbee used handwritten notes to track student behavior, but thereafter began to record her students' behavior on what she called "point sheets." (ECF No. 44 at 2, ¶ 5.) Ms. Ellerbee asserts that she recorded anything Plaintiff told her in her notes or point sheets, particularly if there was inappropriate touching. (*Id.*) Those sheets and notes, however, only reflect a few incidents where SM inappropriately touched another student, teacher, or Plaintiff—on September 6, SM pulled up Plaintiff's dress (ECF No. 35 at 4); on September 10, SM attempted to pull up Plaintiff's dress and another teacher's shirt (ECF No. 35 at 4); on September 25, SM pulled up the shirt of a student and visiting teacher (ECF No. 35 at 10); on October 2, SM tried to pull up the shirt of another student (ECF No. 29, Ex. 1 at 38); and on October 4, SM "grabbed another female student inappropriately" (ECF No. 30, Ex. 1 at 18). No other similar incidents were reported by Ms. Ellerbee during

---

[4] Dr. Rucker states in her affidavit that the first time she was aware of Plaintiff's issues with any student's behavior was in late October or early November 2018. (ECF No. 40 at 3, ¶ 10.)

the first semester of the 2018–19 school year. (*See* ECF No. 29, Ex. 1; ECF No. 30, Ex. 1; ECF No. 31, Ex. 1; ECF No. 35 at 4–12.) Plaintiff maintains that from September to November 2018, she experienced improper touching by SM on an almost daily basis— including lifting her dress and exposing her underwear—but also admits that SM's conduct was recorded on Ms. Ellerbee's point sheets. (ECF No. 50, Ex. 2 ¶¶ 8–10; ECF No. 41 at 2.)[5]

Plaintiff acknowledges that Ms. Ellerbee and Dr. Rucker took some remedial steps to mitigate her contact with SM. (ECF No. 50, Ex. 2 ¶¶ 14, 24.) In November 2018, Ms. Ellerbee attempted to reduce Plaintiff's interactions with SM by having a different teacher's assistant—who was not technically assigned to SM—accompany SM for his hallway travels to general education classes. (ECF No. 28 at 24.) Although she admits that this solution was a "reprieve," Plaintiff maintains that she was "forced to continue accompanying SM" because the other assistant refused to continue to accompany an unassigned student. (ECF No. 50, Ex. 2 ¶ 14.) In an emotional email, Plaintiff responded to Ms. Ellerbee's suggestions by implying that her plan was, in effect, a lack of confidence in her teaching skills. (ECF No. 28 at 24.)

Plaintiff forwarded the November 15, 2018 email exchange to Dr. Rucker, and explained to Dr. Rucker that she felt that Ms. Ellerbee had no faith in her ability to work with the students. (*Id.*) She expressed difficulty in transitioning to her present assignment. (*Id.*) In response, Dr. Rucker offered to meet and discuss this situation.

---

[5] While SM "inappropriately touched both male and female students, he much more frequently inappropriately [touched] female adults." (ECF No. 50, Ex. 2 ¶ 15.)

(*Id.*)  Plaintiff replied that "I see no need to meet because the problem can't be fixed at this point its [sic] been done.  I will just do the best I can." (*Id.* at 30.)  Plaintiff, in a January 30, 2019 email to Dr. Rucker, requested to return to the E.D. classroom.  (*Id.* at 32.)  Dr. Rucker replied that, while Plaintiff would continue in her position until the end of the year, "we will look at all staffing and make the best decision for next year."  (*Id.*)

At some point in early 2019, Plaintiff began documenting bruises resulting from her experiences using Employee Injury Reports.[6]  (ECF No. 50, Ex. 2 ¶ 16; ECF No. 28 at 51–60; ECF No. 28, Ex. 1 at 1–28.)  The School Board, however, notes that Plaintiff did not mention in her reports any form of touching of her private areas, lifting of her skirt, or contact with her breasts until the March 13, 2019 report.  (ECF No. 27 ¶ 25.)  Plaintiff explained that her Chesterfield Education Association ("CEA") representative did not tell her to include such information.  (ECF No. 50, Ex. 2 ¶ 16.)  On March 1, 2019, Dr. Rucker met with Plaintiff and provided her with CCPS Worker's Compensation forms and information to enable her to take the next step in the injury reporting process.  (ECF No. 40 at 4, ¶ 12.)  Plaintiff, however, did not elect to file a Worker's Compensation claim.  (*Id.*)

SM's assaultive behavior culminated in an event on March 13, 2019 in a general education computer class.  (ECF No. 50, Ex. 2 ¶ 17.)  To prevent SM from tampering with the computers in the room, he was placed in a chair on the carpet.  (*Id.*)  After he attempted to stick his fingers in an electrical outlet, Plaintiff relocated SM to block his

---

[6] It is unclear in the record whether Plaintiff's injuries as detailed in the Employee Injury Reports are solely because of SM's behavior or if she sustained some of the reported injuries from other students.

8

access to the outlet and prevent him from accidentally electrocuting himself. (*Id.*) In response, SM grabbed Plaintiff's crotch area repeatedly and attempted to twist his fingers in her vagina. (*Id.* ¶ 18.) When Plaintiff resisted, SM continued grabbing her private areas. (*Id.*) The computer lab teacher at that time intervened to assist in controlling him. (ECF No. 45 ¶ 5.) Plaintiff was extremely upset and humiliated since the incident occurred in front of the entire classroom. (ECF No. 50, Ex. 2 ¶ 19.) The incident was immediately reported to Ms. Ellerbee. (*Id.* ¶¶ 20–21.)

Both Plaintiff and the computer lab teacher notified Dr. Rucker of the incident in emails labeling the incident "sexual assault." (ECF No. 28 at 33–34.) Plaintiff also filled out an Employee Injury Report describing the incident. (ECF No. 28, Ex. 1 at 26.) Although Plaintiff had previously filed twenty-four Employee Injury Reports, the report of the March 13, 2019 incident was the only report that mentioned touching of her private parts. (ECF No. 28 at 51–60; ECF No. 28, Ex. 1 at 1–28.) In response, Dr. Rucker opened a Title IX investigation, reporting the events of March 13 as a "founded Title IX incident." (ECF No. 50, Ex. 2 ¶ 24.) She also took several remedial actions to safeguard Plaintiff from further abuse by SM. (*Id.* ¶ 24.) Dr. Rucker met with Plaintiff on March 18, 2019 to review the remedial plan. (ECF No. 40 at 4–5, ¶ 13.) First, Plaintiff's bus assignment was altered so that she would not be on the same bus with SM. (ECF No. 50, Ex. 2 ¶ 24.) Secondly, Plaintiff's schedule was revised so that she would not accompany SM by herself to and from the classroom. (*Id.*) Thirdly, Dr. Rucker provided additional support to safeguard Plaintiff from being alone with SM at any time without others available to assist. (*Id.*) Dr. Rucker offered Plaintiff the opportunity to move to another

classroom, but she declined.  (ECF No. 28 at 20.)  Plaintiff also acknowledged that Dr.

Rucker offered her the opportunity to transfer to another school.  (ECF No. 50, Ex. 2

¶ 28.)  "Every time I get called into Dr. Rucker's office she tries to push another school

on me. . . . Dr. Rucker offered me whatever would make me happy but I wasn't sure how

to answer that."  (ECF No. 28 at 38.)

 In a May 6, 2019 letter, Dr. Rucker reiterated the remedial steps that had been

taken to ensure Plaintiff's safety and informed her that the investigation of the March 13

incident had been determined to be a Title IX violation.  (ECF No. 50, Ex. 5 at 1.)

Dr. Rucker also advised that the protective measures would remain in place.  (*Id.*)

Although Plaintiff experienced no other assaultive contact with SM, she continued to

have indirect contact which she found unsettling.  (ECF No. 50, Ex. 2 ¶ 29.)

 In addition to the emails, reports, and other documents referenced above, the

School Board's proffered evidence includes affidavits prepared by two expert witnesses

in the special education field.  Heather Applegate, Ph.D., ("Dr. Applegate") is a

practicing child psychologist, who previously served as a school and clinical

psychologist.  (ECF No. 43 at 8–11.)  Dr. Applegate concluded in her affidavit that

"[a]ny special education Instructional Assistant ("IA") should have known, and should

have expected that [an I.D. child] might grab various parts of a person's body (including

'sexual' areas), or lift shirts solely in order to get attention, as a distraction, or to get

someone to 'back off.'"  (*Id.* at 1.)  Dr. Applegate also opined that "[i]t is not reasonable

for a special education IA to conclude that a young child with Down's Syndrome and

ADHD, who responds negatively to instruction or commands by grabbing and squeezing body parts, is engaging in sexually harassing behavior." (*Id.*)

Laura Jackson ("Ms. Jackson") served as the Coordinator of Special Education, Pre-K–5th Grade at Providence Elementary School during the 2018–19 school year. She has a master's degree in special education and is certified in instructing learning disabled students. (ECF No. 39 at 13–14.) In her affidavit outlining her expected testimony as an expert witness, she concluded that "SM's hyperactivity and conduct problems fell within the clinically significant range, and concerns were raised regarding SM's anger control, developmental social disorders and emotional self-control." (*Id.* at 2.) Ms. Jackson also concluded that "[a]ny teacher or IA during the 2018–2019 school year knew and/or should have expected that SM would grab body parts, including 'sexual areas.' As part of SM's acting out from frustration or defiance, he would grab various parts of other persons' bodies, both male and female and both students and adults." (*Id.* at 3.)

Plaintiff has not produced any expert nor other testimony that clearly contradicts Ms. Jackson and Dr. Applegate's descriptions of SM's behavior as a normal part of his disability. Rather, Plaintiff relies almost exclusively upon her own statements and testimony to support her argument that a material dispute of fact exists.

## III.   DISCUSSION

The matter at hand is a particularly delicate one. Children have a right to receive public education, which schools must provide regardless of any disability or condition the child may have, and Plaintiff has a right to be free from a sexually hostile work environment. Public schools are required to provide "free appropriate public education"

11

for all students, regardless of disability. 20 U.S.C. § 1412(a)(1)(A); Va. Code Ann.
§ 22.1-214(A). Moreover, public schools must ensure that, "[t]o the maximum extent
appropriate, children with disabilities . . . are educated with children who are
nondisabled." 34 C.F.R. § 300.114(a)(2)(i). However, under Title VII, an employer
cannot "fail or refuse to refer for employment, or otherwise . . . discriminate against, any
individual because of his race, color, religion, sex, or national origin." 42 U.S.C.
§ 2000e-2(b). Thus, this Court is compelled to navigate between a school's requirement
to educate difficult students and an employee's right to be free from discrimination and
harassment.

To successfully state a hostile work environment claim, the "plaintiff must prove
that the offending conduct (1) was unwelcome, (2) was based on her sex, (3) was
sufficiently severe or pervasive to alter the conditions of her employment and create an
abusive work environment, and (4) was imputable to her employer." *Ocheltree v. Scollon
Prods., Inc.*, 335 F.3d 325, 331 (4th Cir. 2003). For the purposes of summary judgment,
the School Board does not dispute that the March 13, 2019 incident consisted of
unwelcome conduct. (ECF No. 27 at 17.) Although Plaintiff can demonstrate that the
conduct was unwelcome, Plaintiff has failed to satisfy the remaining elements of a hostile
work environment claim.

When establishing that the offending conduct is based upon her sex, a plaintiff
must show that the harassment would not have occurred but for the plaintiff's sex. *Hoyle
v. Freightliner, LLC*, 650 F.3d 321, 332 (4th Cir. 2011). "Consequently, a trier of fact
may reasonably find discrimination when 'a female victim is harassed in such sex-

specific and derogatory terms . . . as to make it clear that the harasser is motivated by general hostility to the presence of women in the workplace.'" *Id.* (quoting *Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 80 (1998)).  Plaintiff, relying principally upon her own account of SM's constant assaults, avers that this young, developmentally disabled child's conduct was motivated by her gender.  She alleges that SM touched her and other students inappropriately almost every day.  (ECF No. 50, Ex. 1 at 2; Ex. 2 ¶ 8.)  Specifically, Plaintiff maintains that SM's gender motivation is evidenced by his assaultive patterns.  And "although SM inappropriately touched both male and female students, he much more frequently inappropriately [touched] female adults, such as his teachers and aides."  (ECF No. 50, Ex. 2 ¶ 15.)

Plaintiff's assertions are belied by ample evidence in the record showing that not only was SM incapable of distinguishing based upon sex, but that his conduct was typical of children with his disabilities.  Ms. Jackson explains in her affidavit that SM often was "disruptive, intrusive, or threatening and [had] a tendency toward defiance and aggression."  (ECF No. 39 ¶ 6.)  Due to this tendency, Ms. Jackson further explains that:

> As part of SM's acting out from frustration or defiance, he would grab various parts of other persons' bodies, both male and female and both students and adults . . . . Aggressive reactions and inappropriate touching of "sexual" areas by a young special education student are objectively viewed by the special education profession not as sexual harassment or sexual assault but as common behavior for children who do not know limits that general education students might know.

(*Id.* ¶¶ 7–8.)  Dr. Applegate expresses the same observations in her expert opinion.  (ECF No. 43 at 5–6.)  SM's primary care physician also emphasizes that much of his behavior originates from his disabilities: "[d]ue to his developmental delay, [SM] may react

13

impulsively and with anger and may conduct himself in ways that are often viewed as socially inappropriate. [SM] is often not malicious in his behavior and often does not understand the repercussions of his actions." (ECF No. 28 at 13.)

The overwhelming evidence demonstrates that SM's conduct was a product of his disability and not the result of any discrimination on his part. Indeed, as Ms. Jackson explains, "SM was incapable in the 2018–19 school year of distinguishing between the male and female gender. SM had neither the capacity, nor the ability, during the 2018–19 school year to a) harass anyone because of gender or b) understand that his behavior could be sexual." (ECF No. 39 ¶ 9.) As noted by the School Board's experts, SM's behavior was due to his disability and his desire for a reaction and attention, not because he had any sexual intentions. Plaintiff has not provided any expert opinion in rebuttal to show that SM could distinguish based upon sex, that his conduct was based upon sex, or that his conduct would be considered outside the norms expected of a child of his age with his disabilities. Plaintiff's sole support for her contention that his conduct was based upon sex is that, although SM touched males and females, he more frequently touched females. (ECF No. 50, Ex. 2 ¶ 15.) This Court is unconvinced by Plaintiff's assertion that a prepubescent child operating with an intellectual disability could act in such a sex-based manner to cause a sexually hostile work environment. The record contains insufficient evidence to demonstrate "clear[ly] that [SM] is motivated by general hostility to the presence of women in the workplace." *See Hoyle*, 650 F.3d at 332 (citation and internal quotations omitted).

Even assuming that SM's conduct was sufficiently based upon Plaintiff's sex, the conduct does not rise to the level of severe and pervasive. Generally, "plaintiffs must clear a high bar in order to satisfy the severe or pervasive test." *E.E.O.C. v. Sunbelt Rentals, Inc.*, 521 F.3d 306, 315 (4th Cir. 2008). A plaintiff must demonstrate that the conduct, under both subjective and objective standards, was sufficiently severe or pervasive to alter the conditions of her employment; in other words, the plaintiff "must show that [she] did perceive, and a reasonable person would perceive, the environment to be abusive or hostile." *Freeman v. Dal-Tile Corp.*, 750 F.3d 413, 421 (4th Cir. 2014) (alteration in original) (internal quotation marks omitted) (quoting *E.E.O.C. v. Cent. Wholesalers, Inc.*, 573 F.3d 167, 176 (4th Cir. 2009)). A plaintiff "must show that the environment was pervaded with discriminatory conduct 'aimed to humiliate, ridicule, or intimidate,' thereby creating an abusive atmosphere." *Cent. Wholesalers*, 573 F.3d at 176 (quoting *Jennings v. Univ. of N.C.*, 482 F.3d 686, 695 (4th Cir. 2007) (en banc)). "'[N]o single factor is' dispositive, as '[t]he real social impact of workplace behavior often depends on a constellation of surrounding circumstances, expectations, and relationships which are not fully captured by a simple recitation of the words used or the physical acts performed.'" *Sunbelt Rentals*, 521 F.3d at 315 (alterations in original) (first quoting *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 23 (1993) and then quoting *Oncale*, 523 U.S. at 81–82).

Based upon an exhaustive review of the record, the Court cannot find more than a scintilla of evidence to support Plaintiff's argument. Plaintiff argues that it was unreasonable for a school employee to "expect[] to be touched on an almost daily basis in

her private parts by a student." (ECF No. 50 at 13.) There is no doubt that Plaintiff, as demonstrated by her own declaration and testimony, subjectively found the environment abusive and felt humiliated. (*See, e.g.*, ECF No. 50, Ex. 2 ¶ 19.) Thus, the subjective standard is satisfied here.

Although Plaintiff repeatedly asserts that she was touched inappropriately almost every day and felt humiliated, there is limited evidence that, under the objective standard, a reasonable person in Plaintiff's role would find this situation abusive and hostile. Aside from Plaintiff's own bare statements, the record shows only three recorded incidents of SM inappropriately touching Plaintiff: SM lifted Plaintiff's dress twice during the first week of school, on September 6 and 10, 2018, and the March 13, 2019 incident in the computer lab. (ECF No. 35 at 4; ECF No. 28, Ex. 1 at 26.) There are a handful of other incidents where SM inappropriately touched other teachers and students. (ECF No. 29, Ex. 1 at 38; ECF No. 30, Ex. 1 at 18; ECF No. 35 at 4, 10.) Contrary to her assertion that the conduct occurred almost daily, Plaintiff herself indicated she reported the incidents to Ms. Ellerbee and she recorded them in the point sheets. (ECF No. 41 at 2; ECF No. 50, Ex. 2 ¶ 13.) The Employee Injury Reports, point sheets, the evidence that SM's conduct was typical of special education students, and Plaintiff's contradictory statements in sum do not support the allegation of repeated, almost daily sexual touching. Plaintiff cannot manufacture a material dispute of fact as to the consistency of the harassment when her own statements and testimony conflict. *See Barwick*, 736 F.2d at 213.

There is no doubt that special education teachers have a very trying and difficult position, "requiring above-average patience and tolerance . . . . [But] 'special education

16

students are prone to disruptive behavior by virtue of their disabilities.'" *Dennis v. Caddo Par. Sch. Bd.*, No. 09-1094, 2011 WL 3117864, at *4 (W.D. La. July 26, 2011) (quoting *Mongelli v. Red Clay Consol. Sch. Dis. Bd. of Educ.*, 491 F. Supp. 2d 467, 478 (D. Del. 2007)). "Courts, moreover, must bear in mind that schools are unlike the adult workplace and that children may regularly interact in a manner that would be unacceptable among adults." *Davis v. Monroe Cnty. Bd. of Educ.*, 526 U.S. 629, 651 (1999). This statement is particularly true when it comes to special education students; students with intellectual and emotional disabilities can often act in ways that are not within the strict confines of normal behavior in a nondisabled child of the same age, much less within the bounds of acceptable adult behavior.

For example, in *Mongelli*, the court found that a high school special education student making inappropriate comments and sexually touching a teacher over the course of a twelve-day period—for which he was criminally charged—did not rise to the level of severe and pervasive. 491 F. Supp. 2d at 480. The court reasoned that the student's conduct would not have "detrimentally affected" an objectively reasonable special education teacher. *Id.* at 481. Notably, the plaintiff did not produce evidence to show that "the tolerance threshold of a reasonable special education teacher . . . was crossed." *Id.* Plaintiff here has similarly failed to produce evidence that SM's conduct crossed the threshold or exceeded behavior reasonably expected from special education students. *See id.*

Additionally, in *Dennis*, the court found that sexual harassment and touching by two high school special education students that occurred on a near-daily basis for an

17

entire semester was not severe and pervasive sexual harassment. 2011 WL 3117864, at *1, *4. In fact, the court found "that a reasonable person in the plaintiff's position, as an aide to special education students, would not have been detrimentally affected by the conduct." *Id.* Although Plaintiff found SM's conduct objectionable, the conduct is not such that a reasonable special education professional would find SM's conduct abusive and hostile. *See id.*; *see also Deen v. Shenandoah Cnty. Pub. Schs.*, 2017 WL 2987205, at *4 (W.D. Va. July 12, 2017) (finding two isolated incidents of racial harassment as insufficient to rise to the level of severe and pervasive). Courts have established, however, that when harassment occurs over several years with little intervention from the school, a reasonable fact finder may find the conduct severe and pervasive. *Peries v. New York City Bd. of Educ.*, No. 97cv7109(ARR), 2001 WL 1328921, at *6 (E.D.N.Y. Aug. 6, 2001). The record here establishes a few isolated incidents occurring over several months like in *Mongelli*, *Deen*, and *Dennis* rather than the consistent, years-long harassment as in *Peries*. Based upon the sum of the factors including the nature of conduct in question, Plaintiff's role, and the expectations of a reasonable special education professional, SM's conduct does not rise to the level of severe and pervasive.

Plaintiff cites several cases in support of her argument that, despite his age and disabilities, SM's conduct was both sex-based and severe and pervasive. Plaintiff first points the Court to the Eighth Circuit's decision in *Crist v. Focus Homes, Inc.*, where the court found that a sixteen-year-old resident's harassment, who "functioned at the level of a two-to-five-year-old child," was sufficiently based on sex to support a Title VII claim. 122 F.3d 1107, 1108, 1111 (8th Cir. 1997). There, the resident committed numerous

serious sexual assaults on the staff—both male and female—including: "pull[ing] at [a plaintiff's] shirt and bra, look[ing] down her shirt, and attempt[ing] to rub his body against hers"; "push[ing] [a plaintiff] against a door, forc[ing] her right hand above her head, pull[ing] open her jeans and her blouse, grabb[ing] her left breast, and push[ing] his weight and erect penis against her stomach"; knocking a plaintiff unconscious; and pulling at the staff's clothing. *Id.* at 1108–09. Moreover, the record evidence suggested the defendant did not take the incidents seriously and did nothing to address safety concerns. *Id.* at 1111. The court reasoned "that the repeated sexual contact by [the resident] and the belief that [the defendant] was not going to do anything to stop it unreasonably interfered with the [plaintiffs'] work performance or created an intimidating, hostile, or offensive working environment." *Id.* *Crist* is distinguishable from the current matter. In *Crist*, the resident was much older than SM and, although he functioned at the level of a two- to five-year-old, was postpubescent at sixteen. *See id.* at 1108. Notably, the resident committed numerous serious sexual assaults on the staff with clear sexual intent. *Id.* at 1108–09, 1111. There is no evidence here that SM's conduct towards Plaintiff occurred with comparable frequency or severity. *See id.*

Plaintiff additionally cites *Gardner v. CLC Pascagoula, LLC* out of the Fifth Circuit as support for her argument that SM's conduct was both sexually motivated and severe and pervasive. 915 F.3d 320 (5th Cir. 2019). However, *Gardner* involved an elderly dementia patient who committed serious sexual assaults and had a long history of violent conduct, including grabbing and groping a nurse and punching her several times. *Id.* at 323–24. Based upon the record at hand, SM's conduct does not rise to the same

level of that in *Gardner*. *See id.* Much like the individual in *Crist*, the resident in

*Gardner* was much older than SM and committed acts of a more violent and obviously

sexual nature. *See id.* at 327 (finding that because "[h]is conduct was far more severe

than other residents' and consisted of physical sexual assault and violent outbursts," a

reasonable jury could find the harassment was severe and pervasive). Accordingly, this

Court will find that there is insufficient evidence in this case to demonstrate sex-based

harassment that is severe and pervasive.

Moreover, the School Board is not liable as a matter of law in this case. "[A]n

employer is liable under Title VII for third parties creating a hostile work environment if

the employer knew or should have known of the harassment and failed 'to take prompt

remedial action reasonably calculated to end the harassment.'" *Freeman*, 750 F.3d at 423

(quoting *Amirmokri v. Baltimore Gas & Elec. Co.*, 60 F.3d 1126, 1131 (4th Cir. 1995));

*see also* 29 C.F.R. § 1604.11(e) ("An employer may also be responsible for the acts of

non-employees, with respect to sexual harassment of employees in the workplace, where

the employer (or its agents or supervisory employees) knows or should have known of

the conduct and fails to take immediate and appropriate corrective action.").

Here, Plaintiff's belief that the School Board would not address her concerns and

issues is not reasonable. Plaintiff repeatedly asserts that Dr. Rucker and Ms. Ellerbee

refused to take her complaints seriously and did nothing to address her concerns. This

statement is refuted by the record; once notified, the School Board took effective

remedial steps to address Plaintiff's situation on two separate occasions.

First, in the fall, Ms. Ellerbee implemented a plan to switch Plaintiff's assigned students, giving her the older students in the classroom to limit her contact with SM. (ECF No. 28 at 24.)  Plaintiff admits that this reduced the alleged harassment and the plan was a "reprieve." (ECF No. 50, Ex. 2 ¶ 14.)  Moreover, by her own admission in several email exchanges, she perceived the situation as unfixable—despite her admission that the alterations reduced the harassment—and refused to meet and talk with Dr. Rucker to further discuss the situation.  (ECF No. 28 at 30.)

Second, after the March 13, 2019 incident, Dr. Rucker immediately put a plan in action.  She altered Plaintiff's bus assignment, adjusted Plaintiff's schedule so she no longer accompanied SM to general education classrooms, and ensured Plaintiff was never alone with SM.  (ECF No. 50, Ex. 2 ¶ 24.)  Plaintiff admits that this plan worked to reduce and eliminate the harassment.  (Id. ¶ 29.)  Dr. Rucker met with Plaintiff several times to resolve the situation, including "offer[ing] [Plaintiff] whatever would make [her] happy."  (ECF No. 28 at 38.)  Plaintiff was offered a transfer to another school or a different classroom at Providence, yet Plaintiff refused, stating that she wanted to only return to her E.D. classroom.  (ECF No. 29 at 20; ECF No. 50, Ex. 2 ¶ 28.)

Based upon these actions, this Court cannot find that the School Board acted negligently.  The School Board attempted to promptly address the harassment within days each time, offering Plaintiff numerous solutions and remedies.  Dr. Rucker offered to meet with Plaintiff in the fall, but she refused to do so.  Indeed, Plaintiff rejected many of the solutions offered after the March 13, 2019 incident.  She makes clear that the sole solution she truly desired was to return to her prior classroom, an option that was

unavailable during the school year. This is clearly different than the plaintiffs in *Crist*, where the defendant showed little interest in providing solutions to address the sexual harassment after multiple incident reports. *See Crist*, 122 F.3d at 1112. Moreover, unlike here, there was conflicting expert testimony in *Crist*, such that a jury could reasonably have found that the defendant's response was inadequate. *See id.*; *see also Turnbull v. Topeka State Hosp.*, 255 F.3d 1238, 1244–45 (10th Cir. 2001) (finding that it was reasonable for the jury to find the defendant hospital negligent when there was trial testimony that the hospital's remedies were insufficient to address a patient's sexual assault on the staff).

Several sister courts have explained that the remedy need only be "an effort directed to reasonably stop the harassment." *Chapman v. Oakland Living Ctr., Inc.*, No. 1:18-cv-345-MR-WCM, 2020 WL 6929064, at * 4 (W.D.N.C. Nov. 24, 2020) (finding that, when the defendant's six-year-old grandchild uttered racial slurs at the plaintiff, spanking the child was a sufficient remedy even though it did not stop the harassment); *see also Youngblood v. Fort Bend Indep. Sch. Dist.*, No. H-13-1876, 2014 WL 11600063, at *2 (S.D. Tex. Nov. 13, 2014) (finding that there was not a racially hostile work environment as the school district properly addressed disciplinary issues). The School Board here expended sufficient effort calculated to curb the harassment. Its efforts were not insufficient merely because Plaintiff was not offered the sole solution she desired—a return to her former classroom. Accordingly, as it responded promptly and adequately, the School Board was not negligent and cannot be liable for the actions of SM.

## IV.  CONCLUSION

This Court sympathizes with Plaintiff and respects the difficulties associated with the services she and all special education teachers provide, but finds no facts supporting her contention that SM, an intellectually disabled, prepubescent child, created a sexually hostile work environment.  Therefore, the School Board's Motion for Summary Judgment (ECF No. 26) will be granted.

An appropriate Order will accompany this Memorandum Opinion.

/s/
_____
Henry E. Hudson
Senior United States District Judge

Date: April 20, 2021
Richmond, Virginia